UMBERG ZIPSER LLP
THOMAS J. UMBERG (SBN 94345)
tumberg@umbergzipser.com
DEAN J. ZIPSER (SBN 94680)
dzipser@umbergzipser.com
CAROLE E. REAGAN (SBN 162674)
creagan@umbergzipser.com
1920 Main Street, Suite 750
Irvine, CA 92614
Telephone: (949) 679-0052

BUCHALTER
A Professional Corporation
ROBERT S. MCWHORTER (SBN 226186)
JACQUELINE N. VU (SBN 287011)
500 Capitol Mall, Suite 1900
Sacramento, CA 95814
Telephone: (916) 945-5170
Email: rmcwhorter@buchalter.com
        jvu@buchalter.com

Attorneys for Plaintiff,
BANC OF CALIFORNIA,
NATIONAL ASSOCIATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| BANC OF CALIFORNIA, NATIONAL ASSOCIATION, a national banking association,<br><br>Plaintiff,<br><br>vs.<br><br>MARY CAROLE MCDONNELL, an individual; DION NORAVIAN, an individual; MERCHANTS BONDING COMPANY (MUTUAL); NORTHERN TRUST CORPORATION; MELVIN CLARK JR., an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.: 8:18-cv-01194-CJC-ADS<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) INTENTIONAL MISREPRESENTATION/FRAUD;**<br>**(2) CONSPIRACY TO DEFRAUD;**<br>**(3) NEGLIGENCE;**<br>**(4) NEGLIGENT SUPERVISION;**<br>**(5) BREACH OF WRITTEN CONTRACT;**<br>**(6) NEGLIGENT MISREPRESENTATION;**<br>**(7) MONEY HAD AND RECEIVED;**<br>**(8) ACCOUNT STATED;**<br>**(9) OPEN BOOK ACCOUNT; AND**<br>**(10) APPOINTMENT OF RECEIVER**<br><br>**DEMAND FOR JURY TRIAL** |

# COMPLAINT

Plaintiff, Banc of California, National Association ("BOC") alleges, on personal knowledge as to itself and its own acts, and on information and belief as to all other matters, for its amended complaint against Mary Carole McDonnell ("McDonnell), Northern Trust Corporation ("Northern Trust"), Melvin Clark, Jr. ("Clark"), Dion Noravian ("Noravian"), Merchants Bonding Company (Mutual) ("Merchants"), and DOES 1 through 20 (collectively, the "Defendants") as follows:

# INTRODUCTION

1.     This action seeks to recover on a $15 million loan that Defendants fraudulently procured from BOC, and which was part of a larger Ponzi-type scheme whereby McDonnell posed as a heiress to a large family fortune and, with the aid of multiple co-conspirators, including her attorney, Barry Rothman ("Rothman"),[1] Clark, a banker at Northern Trust, and Noravian, a licensed notary, obtained loans totaling in excess of $25 million from various parties.  As to BOC in particular, in December 2017, McDonnell and Rothman approached BOC seeking a multi-million "bridge" loan for McDonnell, representing that McDonnell was an heir of the founder of the McDonnell Douglas Corporation and beneficiary of the McDonnell Family Irrevocable Trust of 1964 (the "Family Trust"), which would soon begin distributing approximately $80 million to her.  McDonnell and Rothman suggested that the Family Trust funds could be used as collateral for the loan.

2.     Over the next few weeks, each of the Defendants provided documentation that furthered this scam by affirming McDonnell's identity as heir to the McDonnell family fortune, her right to forthcoming distributions from the Family Trust, and the existence of a Family Trust account at Northern Trust, which held at least $28 million in cash on deposit and which would provide the collateral

---

[1] BOC has alleged claims against the estate of Barry Rothman, arising out of this same loan transaction, through its cross-complaint in Los Angeles County Superior Court case no. BC712138.

for the BOC loan through a signed and notarized control agreement between Northern Trust, McDonnell, and BOC (the "Control Agreement").

3. Relying upon these and other representations from Defendants, BOC and McDonnell entered into an agreement for a loan to McDonnell in the principal amount of $15 million. After McDonnell drew down approximately $14.6 million in loan proceeds, BOC discovered it had been the victim of a sophisticated fraud. McDonnell was not an heir to the Family Trust; Northern Trust did not hold $80 million on deposit for the Family Trust or McDonnell, let alone the $28.6 million represented in Northern Trust account statements and letters and pledged as security for BOC's loan; and Noravian, the notary whose stamp appears on the Control Agreement, never actually witnessed Clark sign the Control Agreement. Northern Trust later claimed that the Control Agreement was a forgery and invalid. Northern Trust further claimed to be unaware of the fraudulent scheme.

4. BOC alleges that this claim is false. Clark and Northern Trust had prior involvement with McDonnell and had aided her perpetration of a similar fraud on at least one other lender, The Credit Junction ("TCJ). By December 2017, TCJ was already breathing down Northern Trust's back for repayment, so assisting McDonnell in obtaining funds from BOC offered a means of relieving that pressure.

5. Needless to say, McDonnell defaulted on the BOC loan and none of the $14.6 million borrowed has been repaid. BOC has been informed by multiple sources and believes that McDonnell has fled the country and currently is living in Dubai, UAE, with no intention of returning.

6. BOC seeks entry of judgment against Defendants, jointly and severally, to recover the damages caused by their fraudulent, negligent and other wrongful conduct as further alleged herein.

**JURISDICTION AND VENUE**

7.    Subject matter jurisdiction previously was based on 28 U.S.C. §§ 1331 as BOC's original complaint (ECF no. 1) alleged claims under the Computer Fraud and Abuse Act (18 U.S.C § 1030) and for false bank entries (under 18 U.S.C. § 1005 and 12 U.S.C. § 503).  Under the original complaint, supplemental jurisdiction was based on 28 U.S.C. § 1367.  In this First Amended Complaint, BOC voluntarily omits and drops these federal claims.  Accordingly, BOC cannot allege any basis for subject matter or supplemental jurisdiction over the claims in this Amended Complaint.  See *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74, n. 6 (2007); *Wellness Community-National v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995); *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243–44 (11th Cir. 2007) ("When [the plaintiff] amended his complaint and failed to include a Title VII claim or any other federal claim, the basis for the district court's subject-matter jurisdiction ceased to exist, and the district court should have dismissed [the plaintiff's] state claims without prejudice."); *Farmer v. Ocwen Loan Servicing*, LLC, 2010 WL 653098, at *1 (E.D. Cal. Feb. 22, 2010) (same).

8.    Venue was previously alleged under 28 U.S.C. §§ 1391(b)(2) and (b)(3), and pursuant to General Order 16-05.

**PARTIES**

9.    BOC is a national banking association whose chief executive office is located at 3 MacArthur Place, Santa Ana, California 92707.

10.    McDonnell is an individual who, at all relevant times, resided in La Cañada Flintridge, California.

11.    Noravian is an individual, who, at all relevant times, resided in Tujunga, California.  Noravian is a licensed notary in California.

12.    Merchants is a surety underwriter formed in Iowa that maintains its principal place of business in West Des Moines, Iowa.  Merchants operates an office and conducts business in this District.  On or about October 31, 2017,

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{173207.2}

3

FIRST AMENDED COMPLAINT

1   Merchants executed a Notary Public Bond for and on behalf of Noravian as notary
2   public in the sum of $15,000.

3         13.    Melvin Clark is an individual who, BOC alleges on information and
4   belief, resides in Pasadena, California. At all relevant times, Clark was Senior Vice
5   President and Managing Director of Northern Trust.  At all relevant times, Clark
6   acted as an agent of, and within the scope of his employment with, Northern Trust.

7         14.    Northern Trust Corporation is a financial services company
8   headquartered in Illinois and doing business in this District.  Northern Trust
9   Securities, Inc., referenced at times herein, is a wholly-owned subsidiary of
10  Northern Trust Corporation.  At all relevant times, Northern Trust had the authority
11  and right to control the work and services provided by its employee and agent
12  Clark.  Northern Trust, by its conduct alleged herein, condoned, supported, and
13  ratified the acts and omissions of Clark.

14        15.    BOC is unaware of the true names, capacities, or basis for liabilities of
15  defendants DOES 1 through 20, inclusive, and therefore sues said defendants by
16  their fictitious names.  BOC will amend this Complaint to allege their true names,
17  capacities, or basis for liability when the same have been ascertained.  BOC is
18  informed and believes and on that basis alleges that defendants DOES 1 through 20,
19  inclusive, and each of them, are in some manner liable to BOC, or claim some right,
20  title, or interest in the personal property collateral as described below that is junior
21  and inferior to that of BOC, or both.

22        16.    At all times relevant to this action, each defendant, including those
23  fictitiously named, was the agent, servant, employee, partner, joint venturer, or
24  surety of the other defendants and was acting within the scope of said agency,
25  employment, partnership, venture, or suretyship, with the knowledge and consent or
26  ratification of each of the other defendants in doing the things alleged in this
27  Complaint.

28

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{173207.2}                                          4

# FACTUAL ALLEGATIONS

## The Loan Application and Approval Process

17.    On or about December 20, 2017, McDonnell and Rothman met with BOC representatives at Rothman's office in Los Angeles.  Rothman was a current customer of BOC and had arranged the meeting.  During this meeting, McDonnell represented that she was an heir of one of the founders of the McDonnell Douglas Corporation, and that she was the beneficiary of the Family Trust.  She further represented that she would receive cash distributions of $80 million from the Family Trust by December 31, 2018, but needed a "bridge loan" to cover personal expenses until those distributions were made.  McDonnell requested that BOC provide her with a loan that she would repay once she received distributions from the Family Trust.  McDonnell and/or Rothman stated that the loan could be secured by Family Trust funds held at Northern Trust.

18.    On December 21, 2017, McDonnell submitted a Personal Financial Statement and Loan Application (the "Loan Application") to BOC, a true and correct copy of which is attached as **Exhibit 1** hereto and incorporated by reference.[2]  McDonnell requested in the Loan Application that BOC provide her with a $10 million revolving line of credit to address her "cash flow" needs "until [Family] [T]rust distributes."

19.    In her Loan Application, McDonnell represented that: (i) she never defaulted on a loan beyond the applicable cure period in any obligation related to either repayment of debt or the collateral securing such debt; (ii) she was never delinquent in the payment of any personal income taxes or real property taxes, (iii) she was never a party to any material claims or lawsuits, or had a material judgment against her, (iv) she had never had a property foreclosed upon or had a debt forgiven.

---

[2] Information covered by Fed. R. Civ. Proc. 5.2 and Local Rule 5.2 has been redacted from this exhibit, as well as other exhibits.

20.    In the Loan Application, McDonnell certified that she made no misrepresentations therein, that all information therein was true and correct, and that she did not omit any important information.

21.    On December 21, 2017, McDonnell also provided BOC with a copy of the Family Trust documents.

22.    Throughout the loan application process, Rothman and McDonnell requested that all communications relating to the loan include and go through them. McDonnell emphasized the confidentiality of the Family Trust. The request was not unusual in the context of high net worth and/or celebrity clients..

23.    On December 26, 2017, Rothman sent a letter to BOC enclosing a proposed draft "Notification and Control Agreement" for BOC's review that identified The Northern Trust Company, through its agent Clark, as the custodian for Northern Trust Account No: XXX-XX7332 (the "Account"). A true and correct copy of this letter is attached as **Exhibit 2** to this Complaint and incorporated by reference. On behalf of McDonnell, Rothman represented in his letter:

> It is contemplated that this document, once approved by you, will be executed by Northern Trust and then returned to me, as I hold all the original signatures. When the loan transacts with you, we will ensure the fact that the enclosed Agreement is delivered to Northern Trust with a written confirmation that it has been delivered.

24.    On January 3, 2018, McDonnell provided BOC with a Northern Trust Securities statement verifying the Account in the name of the Family Trust and reflecting a balance of $28,624,549.20 for the period of November 1, 2017 to November 30, 2017. Clark and Northern Trust provided McDonnell with the statement for this Northern Trust Securities account. A true and correct copy of this

account statement is attached as **Exhibit 3** to this Complaint and incorporated by reference.

25.    On or about January 10, 2018, Rothman sent a letter to BOC (a true and correct copy of which is attached as **Exhibit 4** to this Complaint and incorporated by reference) affirming the details of the Family Trust and McDonnell's rights in it:

> All monies in The McDonnell Family Irrevocable Trust held at Northern Trust Company in the approximate amount of $80 million will be closed as of December 31, 2018, and as a result, all distributions must be made before December 31, 2018.
>
> Mary Carole McDonnell will receive from The McDonnell Family Irrevocable Trust the approximate amount of $80 million after tax by December 31, 2018. Ms. McDonnell has the option to take distribution of approximately $80 million starting February 2018 as a monthly allocation or she can choose to take it quarterly starting March 2018.She will most probably take the distribution monthly.
>
> By December 31, 2018, Ms. McDonnell needs to have taken her full distribution of approximately $80 million after taxes, less any undisputed liens against the Trust, as the Trust is closing on December 31, 2018.

26.    Also in January 2018, in response to BOC's concerns about using the Account as collateral for the loan under the terms of the Family Trust, McDonnell provided BOC with copies of letters to her from Clark and Northern Trust, confirming that the Account name had been changed from the Family Trust to

McDonnell individually.  True and correct copies of these letters are attached as **Exhibit 5** to this Complaint and incorporated by reference.

27.    On January 31, 2018, in response to BOC's request, Rothman sent to BOC an updated version of his January 10 letter, representing that there were no outstanding liens against the Family Trust.  That same day, after multiple rounds of negotiations and revisions, BOC transmitted to Rothman the final version of the Control Agreement for McDonnell and Clark/Northern Trust to execute with notarized signatures.

28.    Also on January 31, 2018, BOC received a letter from Clark and Northern Trust (transmitted through McDonnell) representing that the balance in the Account, totaling $28,624,549.20, would be frozen and held in favor of BOC pursuant to the Control Agreement between BOC and Northern Trust.  A true and correct copy of this letter is attached as **Exhibit 6** to this Complaint and incorporated by reference.   The letter stated:

> Please be advised that Mary Carole McDonnell's balance in her Northern Trust account, which will be under the Bank control agreement with Banc of California, is $28,624,549.20.
>
> The LOC with Banc of California is for $15M but the entire account will be frozen, effective today.  There will be no deposits or withdrawals into this account until the bank control agreement is lifted.  The term of the LOC is for one year, unless closed earlier.  If any questions, please contact Ms. McDonnell or Barry Rothman, Esq. Northern Trust does not communicate with third parties unless directed by Ms. McDonnell or Barry Rothman.

29.    On January 31, 2018, a BOC representative called Northern Trust and asked to speak with Clark.  The Northern Trust representative who answered the

1  phone stated that Clark was ill and not in the office that day.  BOC then asked to

2  speak with another Northern Trust relationship manager and was connected to

3  another Northern Trust representative.  BOC explained that it was calling regarding

4  McDonnell, a customer of Northern Trust, and the current loan transaction, and

5  stated that BOC wanted verification of two aspects of the deal pursuant to the

6  Control Agreement: (1) that the loan will be cash secured at all times (i.e., the funds

7  in the Account would remain in cash form); and (2) that if BOC calls the loan at

8  any time, Northern Trust will immediately tender the funds from the Account.  The

9  Northern Trust representative stated that the McDonnell account was not his

10  account, but that he would pass on the message.

11       30.    The next day, February 1, 2018, BOC received a second letter from

12  Clark and Northern Trust (again transmitted through McDonnell, who also told

13  BOC that Clark was ill and not available for phone calls), answering these two

14  questions and affirming that, "the account is cash secured at all times.  The block is

15  already on the account.  If Banc of California calls the loan at any time in the event

16  of a default, we will immediately tender funds."  A true and correct copy of this

17  letter is attached as **Exhibit 7** to this Complaint and incorporated by reference.

18                    **The Loan Documents and Funding**

19       31.    On or about February 1, 2018, McDonnell delivered the following loan

20  documents to BOC (collectively, the "Loan Documents"):

21            (a)    a Promissory Note, dated February 1, 2018, in the principal

22       amount of $15,000,000 (the "Note"), executed by McDonnell;

23            (b)    a Pledge Agreement, dated February 1, 2018 (the "Pledge

24       Agreement"), executed by McDonnell;

25            (c)    the Control Agreement, dated January 31, 2018, with notarized

26       signatures of Clark on behalf of Northern Trust and McDonnell; and

27            (d)    a Disbursement Request and Authorization, dated February 1,

28       2018 (the "Disbursement Request"), executed by McDonnell.

True and correct copies of the Note, the Pledge Agreement, the Control Agreement, the Disbursement Request are attached collectively as **Exhibit 8** to this Complaint and incorporated by reference.

32.    Under the Note, McDonnell, as maker, agreed to pay the principal amount of $15,000,000 to BOC, plus all accrued, unpaid interest by February 1, 2019.

33.    Under the Pledge Agreement, McDonnell granted BOC a security interest in the Account to secure repayment of the Note.  In the Pledge Agreement, McDonnell represented that she was "the lawful owner" of the Account at Northern Trust "with a minimum balance of $28,624,549.20," and that she possessed "full right, power and authority" to pledge the Account as collateral.

34.    Under the Control Agreement, McDonnell represented that she owned the Account in her own name and granted BOC control over the Account to perfect BOC's security interest under the Pledge Agreement.  The Control Agreement also provided that Northern Trust would accept all instructions from BOC with respect to the disposition, transfer or withdrawal of funds from the Account.

35.    The Control Agreement further provided, among other things, that Northern Trust had an established bank account in McDonnell's name, with the same account number as on the statement provided by McDonnell as alleged above, and that BOC would be the sole secured creditor for that account.

36.    Noravian notarized Clark's signature, on behalf of Northern Trust, on the Control Agreement, thereby representing that he verified Clark's identity and witnessed Clark sign the Control Agreement.

37.    Under the Disbursement Request, McDonnell represented that the primary purpose of the loan was for "Personal, Family, or Household Purposes, or Personal Investment."

38.    One of the conditions of a loan from BOC to McDonnell was that none of the proceeds were to be used in connection with McDonnell's company, Bellum

Entertainment, LLC ("Bellum"), a California limited liability company owned by McDonnell that produces television shows.  On February 2, 2018, Rothman emailed BOC, confirming that "[t]he funds [from the loan] will not be used for Bellum."

39.    The Control Agreement required that BOC receive Account statements on a monthly basis.  In March 2018, BOC received a February 2018 Account statement, which reflected that the Account had a balance of $28,697,541.80.

40.    From February 2, 2018, to March 14, 2018, McDonnell drew down a total of $14,660,255.09 from BOC pursuant to the Loan Documents.

## **False Representations**

41.    The oral and written representations enumerated above were false because, among other things:

(a)    McDonnell was not related to or an heir of the founders of the McDonnell Douglas Corporation;

(b)    McDonnell is not, and was not, entitled to receive a distribution of $80 million – or indeed, any distribution in any amount – from the Family Trust;

(c)    McDonnell, the Mary Carole McDonnell Trust ("Mary Trust"), and The Family Trust do not, and did not at any time in or after December 2017, have any accounts with Northern Trust;

(d)    the Account does not, and did not, have $28,624,549.20 on deposit in or after December 2017;

(e)    McDonnell, the Mary Trust, and/or the Family Trust have never been a lawful owner of, or had any interest in, the Account;

(f)    the Account number belonged to a third party named "McDonald," who is not related to McDonnell, the Mary Trust, or the Family Trust;

(g)    Clark and Northern Trust gave McDonnell the Account statement -- even though the Account belonged to an unrelated third party -- and selected an account with a name almost identical to McDonnell's;

(h)     The Account statement was "doctored" by McDonnell and/or Clark and Northern Trust to change the name of the account holder to the Family Trust;

(i)    McDonnell does not possess, and has never possessed, the "full right, power and authority" to pledge the Account as collateral;

(j)    Noravian did not witness Clark sign the Control Agreement;

(k)    McDonnell presented the Control Agreement to Noravian with Clark's signature already on it, and she and Rothman encouraged Noravian to notarize it despite Clark's absence, representing to Noravian that Clark was not available but would sign Noravian's notary book at a later date;

(l)    the proceeds of BOC's loan to McDonnell were used for business purposes of Bellum; and

(m)    upon information and belief, McDonnell was insolvent, failed to pay her debts in the ordinary course of business, had defaulted and become delinquent on loans beyond any applicable cure period, and had two real properties in foreclosure.

42.    BOC justifiably, reasonably, and detrimentally relied upon each of the oral and written representations enumerated above by entering into the Loan Documents and by loaning $14,660,255.09 to McDonnell.  Each representation described above was material to BOC's decision to enter into the Loan because the representations confirmed McDonnell's identity, her interest in the Family Trust, the value of the Family Trust, the timing of distributions from the Family Trust, the value of the Account, McDonnell's right to pledge the Account as collateral, the absence of any other claims on the Family Trust, and the fully cash-secured nature of the Account and its immediate availability as collateral for the Loan.

43. Had BOC known that these oral and written representations were false and misleading, BOC would not have entered into the Loan Documents or loaned $14,660,255.09 to McDonnell pursuant to the Loan Documents.

44. When BOC started to see evidence of McDonnell using Loan proceeds for Bellum business purposes, and McDonnell started making excuses as to why her distributions from the Family Trust had not started, BOC became concerned about possible default on the Loan. Accordingly, on March 8, 2018, BOC contacted Northern Trust to confirm that there was at least $15 million in the Account and that neither McDonnell nor anyone else was or had been permitted to make any withdrawals from the Account. A Northern Trust representative returned the call on or about March 9, 2018, indicating that no such McDonnell account existed at Northern Trust.

45. On or about March 12, 2018, BOC sent correspondence to Northern Trust, enclosing copies of the executed Control Agreement and the February 2018 Account statement, and requesting confirmation of compliance with the Control Agreement or, in the absence of such confirmation, demanding immediate payment of $14,610,000 based on breach and an event of default. On March 13, 2018, Northern Trust sent a letter in response, stating that "at no time" did McDonnell "maintain an account with the above-referenced account number at Northern Trust Securities . . . or any other Northern Trust entity," and that Account statement "is not reflective of any account Ms. McDonnell held with either NTSI or any other Northern Trust entity at any time." Northern Trust also claimed that Clark's signature on the letters and the Control Agreement had been "forged."

46. On or about March 14, 2018, BOC delivered a written demand for payment (the "Demand") to McDonnell, a true and correct copy of which is attached as **Exhibit 9** to this Complaint and is incorporated by reference. In the Demand, BOC notified McDonnell that the total outstanding balance of the Note was $14,660,255.09 (the "Outstanding Balance"), as of March 14, 2018, and that

BOC would apply $672,201.37 held in an interest reserve account towards the

Outstanding Balance, resulting in the total amount due under the Note of

$13,988,053.72 (the "Total Amount Due"), exclusive of attorneys' fees and costs,

and other charges owed under the Note. In the Demand, BOC requested that

McDonnell pay the Total Amount Due on March 15, 2018 by 12:00 p.m. (PT).

McDonnell has failed to pay BOC the Total Amount Due, or any amount.

### The Fraud on BOC Was Part of a Larger Pattern

47.    Subsequent to McDonnell's default, BOC discovered that other lenders

had been defrauded into lending substantial amounts of money to McDonnell based

on the same or similar false representations, including with the knowing assistance

of Clark and Northern Trust.

48.    Since 2016, McDonnell and her business entities, including Bellum,

obtained multiple loans from The Credit Junction ("TCJ") totaling over $11

million, based on false representations that McDonnell was heir to the large fortune

in the McDonnell Family Trust. The details of the TCJ loan transactions are set

forth in TCJ's complaint against McDonnell, Northern Trust, Clark, and others,

filed in Los Angeles County Superior Court case no. 18STCV07011. Of particular

relevance here, Clark, on behalf of Northern Trust, executed a "Multi-Party

Account Agreement" with TCJ and Bellum (similar to the Control Agreement with

BOC and McDonnell) for purposes of securing a purported Bellum account at

Northern Trust as collateral for the TCJ loans.

49.    Also according to TCJ's complaint, in July 2017, McDonnell proposed

to TCJ that it lend her more money based on her representation that the Family

Trust "has lots of funds at Northern Trust," that the Family Trust would be willing

to move some funds to a separate account at Northern Trust on McDonnell's behalf,

and that Northern Trust would agree to hold $5 million in that account as collateral

for the TCJ loans. Clark and Northern Trust then provided a guaranty letter

expressly agreeing that "on December 31st, 2017, Northern Trust will pay TCJ

1    $5,000,000 from the McDonnell Family Irrevocable Family Trust Account, unless

2    TCJ has already been paid in full." The letter also stated that Northern Trust would

3    maintain sufficient funds in the Family Trust Account to "ensure the payment

4    described above can and will be made timely."

5        50.    As in this case, these representations by McDonnell, Clark, and

6    Northern Trust were false. There was no Family Trust account at Northern Trust,

7    to the extent McDonnell or Bellum ever had any account[s] at Northern Trust, such

8    account[s] had been closed and, therefore, Clark and Northern Trust never intended

9    to satisfy its obligations on the guaranty. By December 31, 2017, neither

10   McDonnell/Bellum nor Northern Trust made any payment to TCJ. Northern Trust

11   never paid on the guaranty.

12       51.    What Northern Trust and Clark did do, however, was assist

13   McDonnell, as outlined above, in obtaining the Loan from BOC, so that McDonnell

14   could pay off part of the debt to TCJ and thereby resolve Northern Trust's liability

15   to TCJ on the guaranty letter. And that is precisely what occurred. In February

16   2018, McDonnell drew down $5 million – exactly the amount guaranteed by

17   Northern Trust -- from the BOC loan and paid the money to TCJ.

18       52.    As alleged by TCJ, Northern Trust has not disputed the authenticity of

19   Clark's signature on the TCJ Multi-Party Account Agreement or the guaranty letter.

20   Clark, therefore, has previously signed false statements relating to McDonnell in

21   the course and scope of his employment for Northern Trust. It is reasonable to

22   conclude, therefore, that Clark also signed the Control Agreement and the letters

23   sent to BOC under his name or, because he was ill and not in the office, that he

24   authorized the Control Agreement and the letters to be signed on his behalf.

25       53.    Even apart from the Clark letters and the Control Agreement, Clark

26   also obtained and gave McDonnell an account statement for another customer's

27   account at Northern Trust Securities (a separate company that Clark did not work

28   for), and he did so in or about December 2017, at a time when he knew or should

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{173207.2}                                    15

have known that McDonnell was misrepresenting her identity and net worth for purposes of defrauding lenders.  Further, Clark gave McDonnell a statement from an account in the name of "McDonald," which further facilitated its use in deceiving BOC and others.   For example, any calls to verify the existence and balance of the "McDonnell Account" would be phonetically indistinguishable from "McDonald Account."  The statement would also be easier to doctor given the similarity.

54.    At all times relevant herein, Clark was acting in course and scope of his employment for Northern Trust.  His interaction with McDonnell arose out of her banking relationship, or what Clark hoped would become a lucrative banking relationship, with Northern Trust.  Issuing credit letters, preparing and executing account control agreements, and otherwise facilitating the acquisition of credit by Northern Trust customers was a foreseeable part of Clark's ordinary duties as a Managing Director at Northern Trust, who, as a private banker, catered in particular to high-net worth individuals.  Northern Trust at all times was in a position to monitor, control, and prevent Clark's actions.  By its conduct, Northern Trust permitted and ratified those actions.

## FIRST CLAIM FOR RELIEF

### (Against All Defendants for Intentional Misrepresentation/Fraud)

55.    BOC incorporates by reference paragraphs 1 through 54, of this Complaint as though fully set forth in this claim for relief.

56.    The oral and written representations enumerated above were made with knowledge of falsity and with the intent that BOC would rely on them in loaning money to McDonnell.

57.    In addition to the many false statements, Clark and Northern Trust also intentionally concealed material facts from BOC.  As alleged above, BOC called Northern Trust on January 31, 2018 to verify certain aspects of the Control Agreement as applied to the Account.  BOC specifically identified Mary Carole McDonnell on this call with Northern Trust.  As of that date, Northern Trust was

1  fully aware that McDonnell had been involved in fraudulent conduct and that

2  Northern Trust had no account in the name of McDonnell or the Family Trust.  In

3  response to direct questions, Northern Trust failed to tell BOC any of that highly

4  material information.

5       58.    BOC relied to its detriment on these misrepresentations and omissions

6  by entering into the Loan Documents and loaning $14,660,255.09 to McDonnell.

7       59.    Had BOC known that these oral and written representations were false

8  and misleading, or been aware of the concealed material information, BOC would

9  not have entered into the Loan Documents or loaned $14,660,255.09 to McDonnell

10  pursuant to the Loan Documents.

11       60.    As a direct and proximate cause of Defendants' false representations,

12  BOC suffered, and continues to suffer, damages totaling at least $13,988,053.72,

13  plus interest, attorneys' fees and costs.  The full nature and extent of these damages,

14  and of Defendants' fraudulent acts, are presently unknown.

15       61.    Defendants acted willfully, maliciously, oppressively and with full

16  knowledge of the adverse effect of their actions on BOC, and with willful and

17  deliberate disregard to the consequences to BOC.  As a direct result of the

18  fraudulent, willful and malicious conduct of Defendants, BOC is entitled to

19  exemplary and punitive damages against them in an amount to be determined as

20  appropriate by the trier of fact.

21  **SECOND CLAIM FOR RELIEF**

22  **(Against Defendants and DOES 1 through 10 for Conspiracy to Defraud)**

23       62.    BOC incorporates by reference paragraphs 1 through 61 of this

24  Complaint as though fully set forth in this claim for relief.

25       63.    Defendants and DOES 1 through 10 engaged in a conspiracy to

26  defraud BOC as described above, and these defendants reached implicit or explicit

27  agreements with each other to aid in defrauding BOC.  In furtherance of their

28

1    agreements, these defendants purposely made the false representations and
2    deliberately concealed material facts from BOC, as detailed above.

3         64.    BOC relied to its detriment on these misrepresentations and omissions
4    by entering into the Loan Documents and loaning $14,660,255.09 to McDonnell.

5         65.    As a direct and proximate result of the fraudulent representations of
6    Defendants, BOC suffered, and continues to suffer, damages totaling at least
7    $13,988,053.72, plus interest, attorneys' fees and costs.  The full nature and extent
8    of these damages, and of these defendants' fraudulent acts, are presently unknown.

9         66.    On information and belief, BOC alleges that these defendants, and
10    each of them, in doing the things herein alleged, acted willfully, maliciously,
11    oppressively and with full knowledge of the adverse effect of their actions on BOC,
12    and with willful and deliberate disregard to the consequences to BOC.

13                      **THIRD CLAIM FOR RELIEF**

14           **(Against Northern Trust and Mel Clark for Negligence)**

15        67.    BOC incorporates by reference paragraphs 1 through 54 of this
16    Complaint as though fully set forth in this claim for relief.

17        68.    Northern Trust and Clark owed a duty to use ordinary care or skill in
18    conducting the business of Northern Trust to prevent their conduct from causing
19    harm to others.

20        69.    As alleged above, Northern Trust and Clark breached their duty by
21    (1) providing BOC with false or inaccurate information, or failing to disclose
22    accurate information when requested, about the Account and McDonnell's
23    complete lack of any existing Northern Trust accounts; (2) providing McDonnell
24    with one or more Northern Trust Securities statements for another customer's
25    account in which McDonnell had no ownership interest (indeed, McDonnell, the
26    Family Trust, and the Mary Trust had no account at any time with Northern Trust
27    Securities), and doing so when Northern Trust and Clark knew or should have

28

1  known that McDonnell had already engaged in fraudulent conduct vis-à-vis at least

2  one other lender.

3      70.    As a proximate result of the Clark's and Northern Trust's negligence,

4  BOC relied on false Northern Trust letters and bank statements as verification of

5  security for the McDonnell loan and on that basis entered into a $15 million loan

6  agreement with McDonnell.

7      71.    As a proximate result of these defendants' negligence, BOC was

8  damaged in an amount to be proven at trial, but which exceeds approximately $14

9  million.

10                    **FOURTH CLAIM FOR RELIEF**

11          **(Against Northern Trust for Negligent Hiring, Retention and**

12                       **Supervision of Clark)**

13      72.    BOC incorporates by reference paragraphs 1 through 54 and 68

14  through 71 of this Complaint as though fully set forth in this claim for relief.

15      73.    Northern Trust owed a duty to use ordinary care or skill in conducting

16  the business of Northern Trust, and in hiring, retaining and supervising its

17  employees and agents, to prevent their conduct from causing harm to others.

18      74.    Northern Trust breached its duty by negligently retaining and/or

19  supervising its employee, Clark.  During the time period between December 2017

20  and February 1, 2018, Clark either was or became unfit and incompetent to serve in

21  his position at Northern Trust in that he purposely or negligently aided McDonnell

22  in obtaining loans from other lenders based on false representations.  This

23  misconduct began as early as 2016, and continued through at least February 2018,

24  as alleged above.

25      75.    Northern Trust had reason to believe that Clark was unfit to perform

26  his duties in that, among other things, by December 2017, the transactions with TCJ

27  had already occurred and McDonnell and/or her company Bellum had already

28  defaulted on the loan[s] guaranteed by Northern Trust.  Further, as of that date,

McDonnell, the Family Trust, and the Mary Trust had no accounts at Northern Trust.  To the extent any of them ever had any account at Northern Trust, all such accounts had already been closed due to McDonnell's wrongful conduct.  And yet, Northern Trust continued to fail to supervise Clark such that he continued to interact with McDonnell as a representative of Northern Trust, provided McDonnell with a Northern Trust Securities statement for another customer's account, and otherwise supported her fraudulent endeavors.  In addition, despite all these red flags and past misconduct, when Northern Trust received inquiries from BOC about McDonnell, her purported Northern Trust Account, and the Control Agreement between Northern Trust and BOC, Northern Trust not only failed to disclose the true facts regarding McDonnell to BOC, it also tasked Clark – of all people – with responsibility for responding to BOC.  Clark either responded by writing or authorizing a letter to BOC with false representations, or alternatively, he failed to respond at all to BOC.  Northern Trust had reason to believe that an undue risk of harm would exist because of Clark's ongoing employment, and in particular, failed to exercise due care in supervision of Clark's interactions with McDonnell and BOC.

76.     As a proximate result of the Northern Trust's negligence, BOC was damaged in an amount to be proven at trial, but which exceeds approximately $14 million.

## FIFTH CLAIM FOR RELIEF

### (Against McDonnell for Breach of Written Contract)

77.     BOC incorporates by reference paragraphs 1 through 54 of this Complaint as though fully set forth in this claim for relief.

78.     McDonnell executed and delivered the Loan Documents as described below.  As part of the Loan Documents, McDonnell, as maker, executed and delivered the Note in favor of BOC.  Under the Note, McDonnell agreed to

immediately pay all outstanding principal and accrued, but unpaid, interest upon an Event of Default under the Loan Documents.

79.    Under the Loan Documents, McDonnell agreed to pay all reasonable attorneys' fees and costs incurred by BOC as a result of McDonnell's Event of Default and/or failure to comply with Loan Documents.

80.    McDonnell breached the Loan Documents by, among other things:

(a)    making or furnishing to BOC false and/or misleading representations, warranties, statements and documents, and/or such representations, warranties, statements and documents to BOC became false and/or misleading after they were made or furnished to BOC, as enumerated above;

(b)    failing to maintain $28,624,549.20 in the Account as required under the Loan Documents;

(c)    upon information and belief, becoming insolvent, unable to pay her debts in the ordinary course of business and/or her assets are less than her liabilities, thereby resulting in judgments or defaults on loans, extensions of credit, or other agreements with creditors that may materially affect her property or her ability to repay the Note or perform her obligations under the Loan Documents;

(d)    failing to act in good faith and fairly with BOC;

(e)    upon information and belief, using the Loan proceeds for prohibited business purposes under the Loan Documents, including, but not limited to, making payments for, or on behalf of Bellum or its affiliated entities;

(f)    causing BOC to be insecure under the Loan; and

(g)    acting or failing to act in violation of the Loan Documents as may be discovered.

81.     McDonnell's breach of the Loan Documents constitutes an Event of Default entitling BOC to accelerate the amount owed and to immediately demand full and complete payment of all outstanding principal and all accrued, unpaid interest owed under the Note, plus all attorneys' fees and costs incurred as a result of McDonnell's breach.

82.     On March 14, 2018, BOC delivered the Demand upon McDonnell, accelerating the amount owed under the Note, and demanding that McDonnell pay $13,988,053.72 by March 15, 2018 at 12:00 p.m. (PT).  Despite the Demand, McDonnell failed and refused to pay BOC.

83.     As a direct and proximate result of the breach of the Loan Documents, BOC has suffered, and continues to suffer, damages totaling in excess of $13,988,053.72, plus interest, attorneys' fees, and costs.  The full nature and extent of these damages are presently unknown and will be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Against Noravian for Negligent Misrepresentation)

84.     BOC incorporates by reference paragraphs 1 through 54 of this Complaint as though fully set forth in this claim for relief.

85.     As further alleged above, Noravian affirmatively represented to BOC that he witnessed Mel Clark sign the Control Agreement and that he obtained Clark's proper identification required under the law prior to signing the Control Agreement.

86.     Noravian's representations to BOC were false because he did not personally witness Clark sign the Control Agreement and did not obtain the required identification of Mel Clark required under the law prior to signing the Control Agreement.

87.     By notarizing the Control Agreement, Noravian made these material representations to induce BOC to enter into the Control Agreement and to loan money to McDonnell.

88.    As a party to the Control Agreement and as part of his statutory duty,
Noravian owed a duty to BOC to exercise reasonable care in notarizing Mel Clark's
signature on the Control Agreement.

89.    BOC justifiably and reasonably relied upon Noravian's representations
in entering into the Control Agreement and in loaning millions of dollars to
McDonnell.  BOC was unaware that Noravian's representations were false at the
time it entered into the Control Agreement with McDonnell.

90.    As a direct and proximate cause of the negligent representations by
Noravian, BOC suffered, and continues to suffer, damages in excess of
$13,988,053.72, plus interest, attorneys' fees, and costs.  The full nature and extent
of these damages will be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Against McDonnell for Money Had and Received)

91.    BOC incorporates by reference paragraphs 1 through 54 of this
Complaint as though fully set forth in this claim for relief.

92.    During the period of February 1, 2018 to March 14, 2018, McDonnell
became indebted to BOC in an amount in excess of $13,988,053.72 for money had
and received by her from BOC.

93.    The whole of the above sum has not been paid, although demand
therefor has been made.

94.    There is now due, owing and unpaid from McDonnell to BOC the sum
of not less than $13,988,053.72, together with interest and attorneys' fees and costs
as may be provided by law.

## EIGHTH CLAIM FOR RELIEF

### (Against McDonnell for Account Stated)

95.    BOC incorporates by reference paragraphs 1 through 54 of this
Complaint as though fully set forth in this claim for relief.

UMBERG ZIPSER LLP
ATTORNEYS AT LAW
IRVINE

{173207.2}                                    23

96.    An account was stated by and between McDonnell and BOC in which it was agreed and understood that McDonnell was indebted to BOC in a sum in excess of $13,988,053.72.

97.    The whole of the above sum has not been paid, although demand therefor has been made.

98.    There is now due, owing and unpaid from McDonnell to BOC the sum of not less than $13,988,053.72, together with interest, attorneys' fees and costs as may be provided by law.

## NINTH CLAIM FOR RELIEF

### (Against McDonnell for Open Book Account)

99.    BOC incorporates by reference paragraphs 1 through 54 of this Complaint as though fully set forth in this claim for relief.

100.    From February 1, 2018 to March 14, 2018, McDonnell became indebted to BOC on an open book account for money due in a sum in excess of $13,988,053.72 for money lent to McDonnell at her request.

101.    The whole of the above sum has not been paid, although demand therefor has been made.

102.    There is now due, owing and unpaid from McDonnell to BOC the sum of not less than $13,988,053.72, together with interest, attorneys' fees and costs as may be provided by law.

## TENTH CLAIM FOR RELIEF

### (Against McDonnell for Appointment of Receiver)

103.    BOC incorporates by reference paragraphs 1 through 54 of this Complaint as though fully set forth in this cause of action.

104.    This Court should appoint a receiver to take control and possession of McDonnell's real, personal, and trust property.  McDonnell fraudulently obtained $14,660,255.09 from BOC based upon fabricated bank statements and a Control Agreement from Northern Trust, and litany of intentional misrepresentations about

her family and her right to receive $80 million from the Family Trust. McDonnell's fraudulent conduct toward BOC conforms to a pattern of fraud involving other creditors.

105.   BOC will suffer immediate and irreparable harm or injury unless McDonnell and her agents, representatives, assigns, attorneys, affiliates, officers, servants and employees, those people in active concert or participation with them, and all entities controlled by them, are restrained from, directly or indirectly, transferring, conveying, concealing, secreting, hypothecating, pledging, or otherwise disposing of her real or personal property, except to pay for reasonably necessary living expenses as this Court deems appropriate.

106.   Unless a receiver is appointed, BOC justifiably believes that McDonnell will transfer, conceal, convey, squander, or dispose of her assets so as to avoid recovery to BOC.  If that occurs, BOC will be left without any adequate legal remedy, thereby causing it to suffer immediate and irreparable harm.

107.   BOC has demonstrated a reasonable likelihood that it will succeed on the merits of its claims against Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, BOC prays for judgment against Merchants for compensatory damages up to the limit of Merchants' surety bond, together with fees and costs as allowed by law and such other and further relief as the Court deems just and appropriate.

**WHEREFORE**, BOC prays for judgment against all other Defendants in this action, jointly and severally, as follows:

1.   For general damages in a sum of not less than $13,988,053.72 or an amount according to proof, together with interest thereon at the legal rate;

2.   For exemplary and punitive damages in an amount according to proof at the time of trial;

3.     For appointment of a receiver over all of the real, personal, and trust property of McDonnell pending final judgment;

4.     For a temporary restraining order, preliminary injunction and/or permanent injunction enjoining McDonnell and her agents, representatives, assigns, attorneys, affiliates, officers, servants and employees, those people in active concert or participation with them, and all entities controlled by them, from, directly or indirectly, transferring, conveying, concealing, secreting, hypothecating, pledging, or otherwise disposing of her real or personal property, except to pay for reasonably necessary living expenses as this Court deems appropriate.

5.     For attorneys' fees and costs as allowed by law;

6.     For such other and further relief as the Court deems to be just and appropriate.


Dated:  December 7, 2018                    UMBERG ZIPSER LLP


                                            _____
                                            Thomas J. Umberg
                                            Dean J. Zipser
                                            Carole E. Reagan
                                            Attorneys for Plaintiff BANC OF
                                            CALIFORNIA, NATIONAL
                                            ASSOCIATION

# **DEMAND FOR JURY TRIAL**

Plaintiff Banc of California, National Association, demands a jury trial in this matter.

Dated:  December 7, 2018

UMBERG ZIPSER LLP

_____

Thomas J. Umberg
Dean J. Zipser
Carole E. Reagan
Attorneys for Plaintiff BANC OF
CALIFORNIA, NATIONAL
ASSOCIATION

## PROOF OF SERVICE

I am a resident of the State of California, employed in the County of Orange; I am over the age of eighteen years and not a party to the within action; my business address is 1920 Main Street, Suite 750, Irvine, CA 92614.

On December 7, 2018, I served on the interested parties in this action the within document(s) entitled:

**FIRST AMENDED COMPLAINT FOR:**
**(1)  INTENTIONAL MISREPRESENTATION/FRAUD;**
**(2)  CONSPIRACY TO DEFRAUD;**
**(3)  NEGLIGENCE;**
**(4)  NEGLIGENT SUPERVISION;**
**(5)  BREACH OF WRITTEN      CONTRACT;**
**(6)  NEGLIGENT MISREPRESENTATION;**
**(7)  MONEY HAD AND RECEIVED;**
**(8)  ACCOUNT STATED;**
**(9)  OPEN BOOK ACCOUNT; AND**
**(10) APPOINTMENT OF RECEIVER**

**DEMAND FOR JURY TRIAL**

X   **BY CM/ECF** – The foregoing document was filed using the Court's CM/ECF System ("System").  The System will send an e-mail notification of the foregoing filing to the parties and counsel of record listed above who are registered with the Court's CM/ECF on the date this proof of service was signed.

| | |
|---|---|
| Marcus Petoyan<br>Eric Hahn<br>Ben Meiselas<br>Geragos & Geragos<br>Historic Engine Co. No. 28<br>644 South Figueroa Street<br>Los Angeles, CA 90017 | *Attorneys for Defendant*<br>*Dion Noravian*<br><br>Telephone: (213) 625-3900<br>Facsimile:  (213) 232-3255<br><br>marcus@geragos.com<br>eric@geragos.com<br>meiselas@geragos.com |

| | |
|---|---|
| Shannon M. Benbow<br>Mikouya Sargizian<br>Wood, Smith, Henning<br> & Berman LLP<br>6A Liberty Street, Suite 200<br>Aliso Viejo, CA 92656 | *Attorneys for Defendant*<br>*Merchants Bonding Company*<br><br>Telephone:  (949) 757-4500<br>Facsimile:  (949) 757-4550<br><br>msargizian@wshblaw.com<br>sbenbow@wshblaw.com |
| Brandon D. Fox<br>Jenner & Block LLP<br>633 West 5th Street<br>Suite 3600<br>Los Angeles, CA 90071 | *Attorneys for Defendant*<br>*Northern Trust Corporation*<br><br>Telephone:  (213) 239-5101<br>Facsimile:  (213) 239-2295<br><br>bfox@jenner.com |
| Craig C. Martin *(Pro Hac Vice)*<br>Amanda S. Amert *(Pro Hac Vice)*<br>Alexis E. Bates *(Pro Hac Vice)*<br>Jenner & Block LLP<br>353 N. Clark Street<br>Chicago, IL 60654 | *Attorneys for Defendant*<br>*Northern Trust Corporation*<br><br>Telephone:  (312) 222-9350<br>Facsimile:  (312) 527-0484<br><br>cmartin@jenner.com<br>aamert@jenner.com<br>abates@jenner.com |

| | |
|---|---|
| Marc S. Williams<br>Reuven L. Cohen<br>Jennifer M. Resnick<br>Cohen Williams LLP<br>724 South Spring Street, 9th Floor<br>Los Angeles, CA 90014 | *Attorneys for Defendant*<br>*Melvin Clark Jr.*<br><br>Telephone:  (213) 232-5160<br>Facsimile:  (213) 232-5167<br><br>mwilliams@cohen-williams.com<br>rcohen@cohen-williams.com<br>jresnik@cohen-williams.com |

**FEDERAL:**  I declare that I am employed in the office of a member of the Bar of this Court at whose direction this service was made.

Executed on December 7, 2018, at Irvine, California.